1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   NATHANIEL POPE,

11              Petitioner,                    No. CIV S-10-CV-3017 JAM GGH

12        vs.

13   JAMES WALKER,

14              Respondent.           FINDINGS AND RECOMMENDATIONS

15   _____/

16                            **1. INTRODUCTION**

17              Petitioner, Nathaniel Pope, is a state prisoner proceeding pro se with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of

19   thirty-two years to life following his 2006 conviction in the Sacramento County Superior Court for

20   attempted murder with a penalty enhancement for personally and intentionally discharging a firearm

21   causing great bodily injury.  Here, Petitioner challenges the constitutionality of his convictions.

22                            **II.  CLAIMS**

23              Petitioner presents multiple grounds for relief.  Specifically, his claims are as follow:

24        (1)      The trial court violated his due process right to a fair trial by
                   improperly responding to jury inquiries during deliberations.
25

26                                        1

(2)     Trial counsel rendered prejudicially ineffective assistance by advising him that he should not testify in his own defense.

(3)     The prosecutor committed misconduct during her closing argument when she informed jurors that they could infer intent from the pulling of a handgun.

(4)     The trial court violated his right to due process of law during sentencing by failing to put the aggravating factors on the record.

(5)     The prosecutor violated his right to due process of law by misleading the jurors to believe that his case was gang related.

(6)     Trial counsel rendered prejudicially ineffective assistance by failing to enter an objection when the prosecutor informed the jury during her closing argument that they could infer Petitioner's actions that he intended to kill the victim.

(7)     Appellate counsel rendered prejudicially ineffective assistance by failing to raise the above claims on direct appeal.

Petitioner's second, sixth, and seventh claims all present allegations that he received ineffective assistance of counsel and, therefore, they will be addressed together. Likewise, Petitioner's claims three and five, both alleging that the prosecutor committed misconduct at trial, will be addressed together. Petitioner's remaining claims will be addressed individually. Based on a thorough review of the record and applicable law, it is recommended that both of Petitioner's claims be denied.

### III. BACKGROUND

The relevant facts of petitioner's crime were summarized in the unpublished opinion of the California Court of Appeal, Third Appellate District, as follows:

At the Florin Mall on an October night in 2005, Sheela A. and Treasure R. were confronted by Mimi A., a former school rival of Sheela's. Mimi was accompanied by Mona F.[FN1] Sheela admitted using "gang-related" language (e.g., "Blood") and wearing red during the confrontation. Sheela informed Mimi that while she (Sheela) could not fight Mimi because she might be pregnant, Sakiron D., a friend of Sheela's whom Sheela had cell-phoned during the confrontation, could step in. Sakiron, in turn, informed her friends, Shantel C. and Brittany L., what was underway. And Sakiron and

Shantel then drove together to the Florin Mall.

> FN1.   Although all of the actors involved in the incident were at least 18 years old, we will use their first names for simplicity, as each of the parties has done on appeal.

In the meantime, Sheela and Treasure had been "shown the door" by a mall security guard. Out in the parking lot, these two then ran into Sakiron and Shantel, as well as Brittany and her then-boyfriend, defendant (aka "Mack June"). The confrontation with Mimi was discussed, Sheela and Treasure left, and Brittany and defendant entered the mall and encountered Mimi and Mona.

With defendant essentially behaving like a fight promoter, he and Brittany returned to the parking lot and told Sakiron and Shantel that Mimi wanted to fight someone. Then Mona came out to the parking lot, accompanied by the principal victim in this case, Semisi V.

Mona and Semisi were apparently Tongans, and both were much bigger than Sakiron, Shantel, and defendant (Brittany had left by this point). Semisi stood six feet two inches tall and weighed 280 pounds. Defendant was five feet four inches tall and weighed 130 pounds. Mona and Semisi were talking "smack," making fun of Sheela and the whole situation.

Given the Tongans' size and behavior, Sakiron and Shantel felt nervous. As Semisi spoke, he paced and moved his hands in his pockets or behind his back; he was also wearing blue. Semisi initially thought that it was defendant who wanted to fight a girl; if that was the case, Semisi would take defendant on.

Semisi said to defendant, "where you from, Cuz"? (Evidence indicated this was a Crip identification.) Defendant replied, "from Oak Park Blood." More banter ensued, with Semisi accusing defendant of "BS-ing" him. Defendant appeared nervous, pacing side to side. When Semisi asked defendant how come he had never seen defendant in Oak Park, defendant said something like, "this is why" and pulled out a handgun and fired six shots. Five of the shots hit Semisi (the sixth, apparently a stray, hit a nearby innocent bystander in the foot). Semisi was hit in the chest, abdomen, groin and hand. Seconds passed between each shot.

Although Semisi at trial denied being a Crip, additional evidence showed otherwise. Following his arrest for the shooting, defendant told police officers that he "felt threatened" by Semisi, a Crip, who had "walked toward [him] . . . acting like he wanted to do something to [him]." Defendant also told officers that Semisi had shot at him during a prior altercation. But two other recorded statements about

1   the incident (two in-custody statements from defendant to friends,
2   including one to Brittany) did not raise or even allude to the issue of
    self-defense.

3   *People v. Pope*, 2008 WL 4358683 at *1-*2.

4          Following a jury trial, Petitioner was convicted of attempted murder.  In addition, the

5   jury found true a penalty enhancement for personally and intentionally discharging a firearm and

6   causing great bodily injury.   Petitioner was sentenced to a term of thirty-two years to life

7   imprisonment with the possibility of parole.

8          Petitioner timely appealed his conviction to the California Court of Appeal, Third

9   Appellate District on the grounds that the trial court improperly responded to jury inquiries during

10  deliberations, claim one in his federal habeas corpus petition.  The court affirmed his convictions

11  with a reasoned opinion on September 24, 2008.  He then petitioned the California Supreme Court

12  for review of the appellate court's decision.  The court denied review without comment on December

13  23, 2008.  Petitioner next sought habeas corpus relief in the California Superior Court on claims two

14  through seven, as identified in his federal habeas corpus petition.  The court denied his petition with

15  a reasoned opinion on November 25, 2009.  He then filed a habeas corpus petition raising identical

16  claims in the California Supreme Court.  The court denied his petition without comment on October

17  12, 2010.   This federal petition for writ of habeas corpus was filed on November 9, 2010.

18  Respondent filed its answer on April 18, 2011 and Petitioner filed his traverse on September 6, 2011.

19              **IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW**

20         The statutory limitations of federal courts' power to issue habeas corpus relief for

21  persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

22  Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

23         An application for a writ of habeas corpus on behalf of a person in
           custody pursuant to the judgment of a State court shall not be granted
24         with respect to any claim that was adjudicated on the merits in State
           court proceedings unless the adjudication of the claim-
25

26                                                 4

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).

Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 784-785, citing *Harris v. Reed*, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington, supra*, 131 S.Ct. at 785, citing *Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. at 786, citing *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or . . could have supported[] the state court's decision; and then it must ask whether it is possible

5

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id*. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" *Id*. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*., citing *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. *See Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. *Woodford v. Viscotti*, 537 U.S. 19, 123 S. Ct. 357 (2002). Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington, supra*, 131 S.Ct. at 786-787. "Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.

1   *Wright v. Van Patten*, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of settled

2   law to unique situations will not qualify as clearly established.  *See e.g., Carey v. Musladin*, 549

3   U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state sponsored practices

4   to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

5   unnecessary showing of uniformed guards does not qualify as clearly established law when

6   spectators' conduct is the alleged cause of bias injection).  The established Supreme Court authority

7   reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as

8   opposed to a pronouncement of statutes or rules binding only on federal courts.  *Early v. Packer*, 537

9   U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

10      The state courts need not have cited to federal authority, or even have indicated

11   awareness of federal authority in arriving at their decision.  *Early, supra*, 537 U.S. at 8, 123 S.Ct.

12   at 365.  Where the state courts have not addressed the constitutional issue in dispute in any reasoned

13   opinion, the federal court will independently review the record in adjudication of that issue.

14   "Independent review of the record is not de novo review of the constitutional issue, but rather, the

15   only method by which we can determine whether a silent state court decision is objectively

16   unreasonable."  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

17      Finally, if the state courts have not adjudicated the merits of the federal issue, no

18   AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law.

19   *James v. Ryan*, __F.3d__, 2012 WL 639292 *18-19 (9th Cir. 2012).

## V.  DISCUSSION

21   **A.  Jury Inquiries (Petitioner's Claim One)**

22      Petitioner claims that the trial court violated his Sixth and Fourteenth Amendment

23   rights to due process and a fair trial by improperly responding to jury inquiries during deliberations.

24   It appears that Petitioner's claim focuses primarily on three questions asked by the jury on December

25   6, 2006 at 4:20 p.m., December 7, 2006 at 3:00 p.m., and December 11, 2006 at 11:40 a.m.  The

questions concerned California law as it relates to different types of self-defense. Petitioner alleges that the trial court's answers to those questions were "grossly inadequate and misleading." Furthermore, Petitioner argues that the trial court's response to the jury's third questions, which recommended that they refer to CALJIC 200, was "surprisingly vague." Instead, Petitioner contends that the trial court should have referred the jury to review CALJIC 505 and CALJIC 604, the modified pattern jury instructions already given on self-defense and imperfect self-defense. According to Petitioner, the jury inquiries indicated that the jurors were confused about how much significance to assign to his state of mind in assessing his claim of self-defense. The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining as follows:

> At the outset, we reject the People's claim that, because the record does not show whether defendant objected to the trial court's responses, defendant has forfeited this contention on appeal. There is no record of the discussions between the court and counsel regarding these inquiries and responses. And Penal Code section 1259 authorizes us to review "any instruction . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

> The law that guides our review of the challenged trial court responses stems from <u>Penal Code section 1138</u>, which provides as relevant: "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, . . . the information required must be given[.]" As our state Supreme Court has explained: "The [trial] court has a primary duty to help the jury understand the legal principles it is asked to apply. (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 250-251.) This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under <u>section 1138</u> to determine what additional explanations are sufficient to satisfy the jury's request for information. Indeed, comments diverging from the standard are often risky . . . . But a court . . . must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*), italics in original.)

> The three jury inquiries, the trial court's responses thereto, and our

analysis of each are as follows:

**1.** The **first inquiry** was made at 3:00 p.m., after the jury had deliberated about one day-

**Jury inquiry:** "Legal clarification on how much weight can be attached to the consideration of **gang** activity as it relates to the presence of a threat (the need for the defendant to defend himself because they were both **gang** members participating in a conversation that was escalating)."

**Trial Court Response:** "The jurors are respectfully referred to [CALJIC No.] 1403 at page 24. The jurors are reminded to read each instruction in light of all the others. [¶] As jurors you must decide what the facts are. It is up to you, exclusively, to decide what happened, based only on the evidence that has been presented to you in this trial. It is then up to you, as jurors, what weight, if any, to give that evidence in accordance with all of the other instructions I have given you."

(CALJIC No. 1403 stated, as pertinent, that the jury could "consider evidence of **gang** activity only for the limited purpose of deciding whether: [¶] . . . [¶] The defendant actually believed in the need to defend himself[.]")

**Analysis:** The trial court acted properly. The court referred the jury to the applicable legal point that the jury could consider evidence of **gang** activity in deciding whether defendant actually believed in the need to defend himself. The court then properly deferred to the jury's factfinding role in deciding what weight to give this evidence.

**2.** The **second inquiry** was made on the second day of actual deliberations at 11:40 a.m.-

**Jury Inquiry:** "Do we have to follow the jury instructions in sequential order? Specifically, do we have to determine the defendant's right to self defense (3471 page 42) before we consider the types of self defense?"

**Trial Court Response:** "The jury need not follow or consider jury instructions in sequential order. [¶] The jury may consider the jury instructions and findings of fact in whatever order it chooses."

(The reference to "3471 page 42" was to <u>CALJIC No. 3471</u>, which provided:

"A person who engages in mutual combat or who is the first one to use physical force has a right to self-defense only if [he indicates he wants to stop fighting and does stop]. [¶] . . . [¶] If a person meets

9

these requirements, he then has a right to self-defense if the opponent continues to fight." (Bold in original.))

**Analysis:** Focusing reasonably on the jury's point about sequential order, the trial court properly told the jury that it did not have to proceed in sequential fashion.

**3.** The **third inquiry** was also made on the second day of actual deliberations, this time at 2:00 p.m.-

**Jury Inquiry:**

"1. Does the law state that someone has to have the right to self-defense (page 42) before acting in self-defense[?]

"2. Or, does acting in self-defense without the right [ ] constitute imperfect self-defense?"

(The reference to "page 42" again referred to CALJIC No. 3471: "**Right to Self-Defense: Mutual Combat or Initial Aggressor**".) (Bold in original.)

**Trial Court Response:**

"1. The jury may disregard the numerical, sequential order of the instructions. The jury may further disregard the title (bold) or any instruction and instead look to the content of the instruction. The jury is asked to review instruction number 200 (p. 9).

"2. This is a question of fact for the jurors. The Court may not answer the question for the jury."

(The trial court's reference to "instruction number 200 (p. 9)" referred the jury to CALJIC No. **200. Duties of Judge and Jury**," which stated as pertinent: ". . . [¶] . . . [¶] Pay careful attention to all of these instructions and consider them together . . . . [¶] . . . [¶] Some of these instructions may not apply, depending on your findings about the facts of the case . . . . After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.")

**Analysis:**

Apparently following up from the jury's second inquiry (i.e., the jury referred once again to instruction "page 42," boldly entitled "**Right to Self-Defense** . . ."), the trial court emphasized that the jury could disregard the sequential order as well as the bold titles of the instructions, focusing instead on their content. The trial court then directed the jury to review CALJIC No. 200. CALJIC 200 told the jurors to pay careful attention to all of the instructions, to consider

10

them together, and, after deciding what the facts were, to follow the instructions that apply to those facts. This direction from the court told the jurors to follow the instructions that applied to the facts in the case (here, the facts did not show mutual combat or initial physical aggressor on the subject of self-defense, but did raise other issues of self-defense). The trial court had originally provided "full and complete" instructions on self-defense ("**Justifiable Homicide: Self-Defense or Defense of Another,**" CALJIC No. 505) and imperfect self-defense ("**Attempted Voluntary Manslaughter: Imperfect Self-Defense** . . . ," CALJIC No. 604). (See *Beardslee, supra,* 53 Cal.3d at p. 97.) "Where the original instructions are themselves full and complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Ibid.*)

Arguably, it was in the context of the jury reviewing the original instructions and following those instructions that applied to the facts the jury had found, that the trial court referred to the jury's third inquiry as a question of fact. And the trial court may have been a bit gun-shy in its third response, not knowing what the jury meant by "right to self-defense" (i.e. actual *and* reasonable belief in need to defend--i.e., self-defense; or an actual *but* unreasonable belief in need to defend--i.e., imperfect self-defense; the trial court could have had the jury clarify this point). The trial court could have *explicitly* referred the jury to CALJIC No. 505 (self-defense) and to CALJIC No. 604 (imperfect self-defense). But as we have noted, the trial court did provide these two instructions, in complete fashion, and did, albeit indirectly, direct the jury to them.

Notwithstanding all of this, though, the jury's third inquiry certainly can be read as posing a question of law. Defendant argues that through this inquiry the jury "made plain . . . their lack of understanding of the central importance of considering a defendant's state of mind for purposes of evaluating a self-defense issue, i.e., whether the defendant actually believed he needed to use deadly force to defend himself . . . . [¶] The jury[ ] . . . felt they needed to somehow determine whether the 'right' to self defense existed in the first place." But as we have seen, the trial court, in its response to the jury's related first inquiry, instructed the jurors that they could consider evidence of **gang** activity in deciding whether "[t]he defendant actually believed in the need to defend himself[.]" And in response to the third inquiry, the trial court implicitly directed the jurors to the full and complete self-defense and imperfect self-defense instructions it had originally given.

In the end, what the jury really was asking in its third inquiry was whether defendant had acted in imperfect self-defense by shooting Semisi before he had the right to self-defense. As the People note, "[i]f the jury followed the judge's instruction to reread all the jury

11

instructions they would be able to see their error.  Indeed, they did so."[FN2]

> FN2.    The jury claimed to be deadlocked after only one ballot, which was 10-2, telling the trial court, "we tried to answer the questions we were debating and we've read and re-read your instructions . . . ." The trial court had the jury deliberate further, and encouraged additional questions from the jury (the jury did not submit any additional questions before reaching its verdict).

> In any event, assuming for the sake of argument that the trial court erred in its third response, there was "no possible prejudice" to defendant.  (See *Beardslee, supra,* 53 Cal3d at p. 97.)  This is because, in light of what the jury really was asking in its third inquiry-i.e., had defendant acted in imperfect self-defense by shooting before having the right to self-defense-and the trial court's response that the inquiry was to be decided by the jury, "the only likely prejudice would [have been] to the prosecution, not the defense" (in the form of a lesser conviction for attempted voluntary manslaughter based on imperfect self-defense).  (*Id.* at p. 98.)

*People v. Pope*, 2008 WL 4358683 at *2-*5 (emphases in original).

There is no specific federal constitutional right to have jury re-instructed on issues of law to which the initial instructions were given, *and were correct when given.  Weeks v. Angelone*, 528 U.S. 235 (2000), is on point factually and the holding of that case applies with equal force to this case.

> Given that petitioner's jury was adequately instructed, and given that the  trial judge responded to the jury's question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry, the question becomes whether the Constitution requires anything more. We hold that it does not.

Weeks, 528 U.S. at 234.

See also Waddington v. Sarasaud, 555 U.S. 179, 191 (2009).

Weeks also based its holding that the jury asked no further questions regarding the re–instruction of the judge.

\\\\\

12

1    Under the circumstances in this case, Petitioner cannot demonstrate that the trial

2  court's responses to the jury's inquiries violated the Weeks holding, or that the appellate court was

3  unreasonable in upholding the trial court's.  Aside from the mere fact that the jury asked several

4  questions, all of which were answered by the trial court, Petitioner offers no real basis for inferring

5  that the jury misinterpreted the law or misapplied the instructions given in his case.  Nor does he

6  offer any support for his assertion that the jury remained confused after the trial court responded to

7  its questions.  Petitioner does not contend that the jury instructions given at his trial were somehow

8  incomplete, erroneous, or otherwise defective.  Indeed, a review of the record demonstrates that the

9  jury was fully and accurately instructed with respect to all counts facing Petitioner, and jurors are

10  presumed to follow the court's instructions.  *Kansas v. Marsh*, 548 U.S. 163, 179 (2006).

11    Following initial deliberations and a single ballot, the jury claimed to be deadlocked.

12  The trial court responded by encouraging the jury to engage in additional deliberations and to submit

13  any further questions that would assist its ability to make a decision.  The jury did not seek any

14  further clarification after its initial questions prior to reaching its verdict.  Just as a jury is presumed

15  to follow its instructions, "a jury is presumed to understand a judge's answer to its question," and

16  a jury's silence following a judge's answer may be presumed to signify that the jury had nothing

17  further to ask.  *Weeks v. Angelone*, 528 U.S. at 234.  Accordingly, the state court's rejecting

18  Petitioner's claim was not contrary to or an unreasonable application of clearly established federal

19  law.  Petitioner is not entitled to federal habeas corpus relief on this claim.

20  **B. Prosecutorial Misconduct (Petitioner's Claims Three and Five)**

21    Petitioner claims that two acts of prosecutorial misconduct rendered his trial

22  fundamentally unfair.  A prosecutor's error or misconduct does not, per se, violate a criminal

23  defendant's constitutional rights.  *See Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing

24  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (for the purposes of federal habeas corpus review,

25  the standard of due process applies to claims of prosecutorial misconduct); *Campbell v. Kincheloe*,

26                    13

829 F.2d 1453, 1457 (9th Cir. 1987)).   On habeas corpus review, allegations of prosecutorial misconduct merit relief "only if the misconduct rises to the level of a due process violation-not merely because [the reviewing court] might disapprove of the prosecutor's behavior." *Towery v. Schriro*, 641 F.3d 300, 306 (9th Cir. 2010)   Moreover, prosecutors are afforded reasonably wide latitude in fashioning closing arguments, *United States v. Birges*, 723 F.2d 666, 671-672 (9th Cir. 1984), and are free to argue "reasonable inferences from the evidence." *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989).   "[P]rosecutors may strike 'hard blows,' based upon the testimony and its inferences, although they may not, of course, employ argument which could fairly be characterized as foul or unfair."  *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir. 1972).

The question to be resolved is whether the alleged prosecutorial misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).   In order to determine whether misconduct occurred, it is necessary to examine the entire proceedings and place the prosecutor's conduct in context.  *Greer v. Miller*, 483 U.S. 756, 765-766 (1987).  Factors to be considered in determining whether habeas corpus relief is warranted include whether the prosecutor manipulated or misstated the evidence; whether her comments implicated other specific rights of the accused; whether the objectionable content was invited or provoked by defense counsel's argument; whether the trial court admonished the jurors; and the weight of evidence against the defendant.  *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. 637, 643 (1974).  "[T]he Darden standard is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations,' ( *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004))."  *Parker v. Matthews*, __S.Ct.__, 2012 WL 2076341 *6 (2012). Thus, even where a prosecutor's argument, questions or behavior is found to be improper, relief is limited to cases in which a petitioner can establish that the misconduct resulted in actual, substantial prejudice.   In AEDPA cases, only tests enunciated by the Supreme Court may be utilized to

1    determine whether prejudicial error occurred. *Id.*

2        **1. Closing Argument**

3        Petitioner claims that the prosecutor improperly informed the jurors during her

4    closing argument that they could infer Petitioner intended to kill the victim from the act of arriving

5    at the Florin Mall, where he knew a fight would be taking place, with a gun in his pocket, or the act

6    of drawing a gun from his pocket during the confrontation with the victim.  According to Petitioner,

7    the prosecutor's argument constituted an improper misrepresentation of the facts because no

8    evidence in the record demonstrated that Petitioner knowingly showed up at the "scene of a fight."

9    Petitioner argues that he suffered prejudice as a result of the alleged error because he otherwise

10    would not have been convicted for the crime of attempted murder.

11        On collateral review, the Sacramento County Superior Court considered and rejected

12    Petitioner's claim that the prosecutor's statements were improper, explaining as follows:

13        Petitioner next claims that the prosecutor committed misconduct by
         arguing in closing that the jurors could infer intent from petitioner's
14        pulling out the hand gun . . . .  Petitioner cites *People v. Nieto Benitez*,
         4 Cal.4th 91, in support.

15
        The claim is meritless.  Reasonable inferences may be made by the
16        jurors from the evidence presented, and a prosecutor is entitled to
         offer conclusions and inferences drawn from the evidence in closing.
17        (*People v. Sully* (1991) 53 Cal.3d 1195, 1234-1236; *Williams v.
         Superior Court* (1969) 71 Cal.2d 1144, 1148).  The prosecutor did not
18        commit misconduct in the argument.

19        Nor does *Nieto Benitiz* support petitioner's argument.  That case
         concerned implied malice and the felony-murder rule, both of which
20        are inapplicable to petitioner's crime, that of attempted murder.

21    Lodged Doc. 6 at 1-2.

22        For these reasons the claim is denied.

23        The state court's rejection of the Petitioner's claim is not contrary to or an

24    unreasonable application of clearly established federal law, nor is it an unreasonable determination

25    of the facts in light of the evidence presented at trial.  In this case, examining the trial record as a

26                                    15

whole, the prosecutor's closing argument did not manipulate or misstate the record evidence. During

closing argument, the prosecutor explained the concept of intent to kill to the jury as follows:

> Timing. The intent to kill can be formed instantaneously. You often hear, especially on these TV shows that we all watch, about premeditation and planning and these sorts of things. That's not what we're talking about here. Someone can -- the second someone pulls a gun from their pocket, or alternatively, the second someone shows up at the scene of a fight with their gun in their pocket knowing they may have to use it, the intent to kill is formed because you're thinking I may have to use this. I may have to kill somebody today, and you load up that .45 in your pocket and you head off to the Florin Mall. You're thinking I may have to kill somebody today.
>
> So it can be formed instantaneously. It doesn't have to be a long drawn-out preparation. It also doesn't have to be well-reasoned. Shooting another human being is very rarely, very rarely a well-reasoned decision.
>
> Finally, think about your common sense. Did he intend to kill the victim? Of course, he did. He didn't pull out his gun and shoot him in the leg, or he didn't -- he pulled out his gun, his large caliber gun, and fired it six times. He was trying to kill him.

RT at 403-404.

As noted by the state court, the prosecutor was permitted to urge the jury to make "reasonable inferences" based on the record evidence presented at trial. *See Gray*, 876 F.2d 1417. Here, the record evidence demonstrated that Petitioner arrived at the Florin Mall, either along with his girlfriend, Brittany, or at some point after her, with a loaded firearm in his pocket. The transcript of an interview given by Petitioner to an investigating officer following the shooting indicated that Petitioner was aware that a fight was escalating between two females at the mall, although it is unclear whether he discovered this fact prior to or upon his arrival at the mall. Witnesses testified that, following his arrival, Petitioner traveled back and forth between the interior of the mall and the mall parking lot, and appeared to be encouraging the two females to fight each other. Finally, several witnesses testified that Petitioner engaged in a verbal confrontation with the victim in the parking lot of the mall, and that the confrontation culminated with Petitioner drawing a loaded firearm from

16

his pocket and shooting the victim multiple times.  Whether Petitioner knew that the fight was imminent prior to his arrival at the mall is not really probative to the jury's determination of whether he possessed the required intent to kill the victim at the time he shot him.  In light of the evidence presented, the prosecutor reasonably pointed out that Petitioner arrived at the mall with a gun in his pocket and that the jury could infer that he knew he could use that gun to kill someone, and that it could infer that Petitioner intended to kill the victim when he drew the gun from his pocket during the confrontation and shot him multiple times.

The state court resolution was not unreasonable.  Petitioner is not entitled to federal habeas corpus relief on this claim.

## 2.  Misleading Jurors

Petitioner claims that the prosecutor violated his right to a fair trial and due process of law by referring to him as a gang member during closing argument when gang charges had not been pled or proven.  Although Petitioner admits that evidence was introduced at trial that both he and the victim used gang-related language during the confrontation in the Florin Mall parking lot, he argues that the use of such language is insufficient to establish that he was, in fact, a gang member.  Accordingly, Petitioner contends that the prosecutor misled the jurors to believe that he was a gang member, improperly impairing their judgment as a jury.

The Sacramento County Superior Court considered and rejected this claim on collateral review, explaining as follows:

> Petitioner next claims that the prosecutor committed misconduct by arguing in closing that the case was gang related and that petitioner was a gang member . . . .
>
> As noted in the Third District's opinion on appeal in the case, testimony established that gang-related language was used during the incident, that the victim made a statement that essentially identified him as being from the Crip gang, and that petitioner responded that he was "from Oak Park Blood."  Petitioner's response appears to have been an identification by petitioner as being from the rival Blood gang.  As this was introduced as evidence at trial, the prosecutor did

1   not commit error in closing argument, and the claim is denied.

2   Lodged Doc. 6 at 2.

3       Once again, Petitioner has failed to demonstrate that counsel's statements rendered

4   his trial fundamentally unfair.  The gang-related evidence presented at trial was properly summarized

5   by the state Superior Court, as set forth above, and the prosecutor's argument constituted a permitted

6   inference based on that evidence.   Accordingly, Petitioner is not entitled to federal habeas corpus

7   relief on this prosecutorial misconduct claim.

8   **C.  Aggravating Factors (Petitioner's Claim Four)**

9       Petitioner claims that the trial court violated his federal right to due process of law

10  at sentencing when it failed, pursuant to California's determinate sentencing law ("DSL"), to place

11  on the record the aggravating factors relied upon in support of the firearm penalty enhancement

12  imposed pursuant to section 12022.53(d) of the California Penal Code.  As a result, Petitioner argues

13  that the court improperly increased his penalty beyond the maximum permissible sentence for

14  attempted murder itself.  The California Superior Court considered and rejected Petitioner's claim

15  on collateral review, explaining as follows:

16          Petitioner next claims that the court improperly imposed a 25-years-
            to-life term for the Penal Code § 12022.53(d) gun enhancement,
17          without stating the aggravating factors for doing so . . . .

18          The claim is meritless.  Penal Code § 12022.53(d) contains no triad;
            rather, the only prescribed term is that of 25 years to life.  As such,
19          there was no reason to state or find any aggravating factors, as there
            was no upper term to impose.  As such, the claim is denied.
20

21  Lodged Doc. 6 at 2.

22       For most California criminal offenses, three terms of imprisonment are specified: a

23  low term, a middle term, and an upper term.  Subsequent to Petitioner's sentencing, the United States

24  Supreme Court determined that the middle term of imprisonment is the maximum term that may be

25  imposed on the basis of the jury's verdict alone.  *Cunningham v. California*, 549 U.S. 270 (2007).

26                                                  18

Thus, consistent with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, the middle term of imprisonment is "the 'statutory maximum' . . . sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  *Blakely v. Washington*, 542 U.S. 296, 303-304 (2004) (emphasis in original).  "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.  The Ninth Circuit Court of Appeals has held that the rule announced in *Cunningham* must be applied retroactively on collateral review.  *Butler v. Curry*, 528 F.3d 624, 639 (9th Cir. 2008).

In the present case, Petitioner stands convicted of attempted murder, in violation of sections 664 and 187 of the California Penal Code, which carries a punishment of either five, seven, or nine years imprisonment.  Based on the jury's verdict, trial court sentenced Petitioner to the middle term of seven years for this offense.  CT at 243.  In addition, the jury found true the special allegation that Petitioner intentionally and personally discharged a firearm, causing great bodily injury to the victim, pursuant to section 12022.53(d) of the California Penal Code, thus subjecting Petitioner to a penalty enhancement of twenty-five years to life, to be served consecutively to any other term of imprisonment imposed.  Fatal to Petitioner's current claim is that his sentence was not based on a judicial selection of an upper term out of three possible terms, as in *Apprendi, Blakeley, or Cunningham*.  As properly explained by state court on collateral review, there was no reason for the trial court to make any additional findings or to specify any aggravating circumstances on the record.  Petitioner's imposed sentence complies with federal constitutional requirements, as set forth above, because it was based solely on the facts reflected in the jury's verdict.

Petitioner additionally appears to complain that the consecutive sentence of twenty-five years to life imposed by the trial court pursuant to the section 12022.53(d) firearm penalty enhancement somehow violated federal law because it was greater than the statutory maximum penalty for the crime of attempted murder.  This claim is beyond the scope of federal habeas corpus

1   review.  *See Cacoperdo v. Desmothenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("The decision to impose

2   sentences concurrently or consecutively is not within the purview of federal habeas corpus.").

3   *Accord Souch v. Shaivo*, 289 F.3d 504, 507 (9th Cir. 2002) ("Because the trial court actually had

4   *absolute discretion* to impose either consecutive or concurrent sentences[,] . . . neither an alleged

5   abuse of discretion by the trial court in choosing consecutive sentences, nor the trial court's alleged

6   failure to list reasons for imposing consecutive sentences, can form the basis for federal habeas

7   relief." (emphasis in original)).  *See also Oregon v. Ice*, 555 U.S. 160 (2009) ( no *Apprendi* error if

8   a judge determines to impose consecutive sentences in lieu of the jury).  While it may seem odd that

9   an "enhancement" penalty is greater than the principal sentence, when viewed as a whole, a life

10   sentence for attempted murder by use of a gun does not rise to the level of an Eighth Amendment

11   violation.  *See Harmelin v. Michigan*, 501 U.S. 957 (1991).  Nor is it unusual that attempts to

12   commit a crime are punished with penalties that are the same in part or in whole.  *See* e.g., 18 U.S.C.

13   § 351(a) and (c): murder of a U.S. official and attempted murder can both be punished with life

14   imprisonment.[1]  Thus, the penalty in petitioner's case is neither cruel nor unusual.

15          To the extent that Petitioner alleges that the trial court violated his due process rights

16   by improperly applying state sentencing law to his case, his claim is not cognizable for federal

17   habeas corpus relief.  A petitioner cannot "transform a state-law issue into a federal one merely by

18   asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997).  Absent

19   fundamental unfairness, federal habeas corpus relief is not available for a state court's misapplication

20   of its own sentencing laws.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Brown v. Mayle*, 283 F.3d

21   1019, 1040 (9th Cir. 2002); *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1989); *Miller v. Vasquez*,

22   868 F.2d 1116, 1118-1119 (9th Cir. 1989).  Petitioner has not demonstrated that the state court

23   applied California's sentencing laws in a way that resulted in fundamental unfairness in his case.

24   _____

25          [1]An actual murder may also involve the death penalty as an alternative sentence.

26                                          20

1    Petitioner is not entitled to federal habeas corpus relief on this claim.

2    **D. Ineffective Assistance of Counsel (Petitioner's Claims Two, Six, and Seven)**

3        **1.  Trial Counsel**

4        Petitioner claims that he was denied the effective assistance of trial counsel in two

5    ways.  Specifically, he contends that counsel (a) improperly advised him that he should not testify

6    in his own defense, and (b) failed to enter an objection when the prosecutor informed the jury during

7    closing argument that it could infer from Petitioner's actions that he intended to kill the victim.

8        The Sixth Amendment to the United States Constitution guarantees to a criminal

9    defendant the effective assistance of counsel.  A showing of ineffective assistance of counsel has two

10   components.  *See Strickland v. Washington*, 466 U.S. 668 (1984).   First, a petitioner must

11   demonstrate that, considering all the circumstances, counsel's performance fell below an objective

12   standard of reasonableness.  *Id.* at 687-88.  In assessing an ineffective assistance of counsel claim,

13   "[t]here is a strong presumption that counsel's performance falls within the 'wide range of

14   professional assistance,'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*,

15   466 U.S. at 689), and that counsel "exercised acceptable professional judgment in all significant

16   decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S.

17   at 689).  As the United States Supreme Court recently emphasized in *Harrington v. Richter*, 131

18   S.Ct. 770, 788 (2011):  "The standards created by *Strickland* and § 2254(d) are both 'highly

19   deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (internal quotations and

20   citations omitted).    The determination to be made, therefore, is not whether counsel acted

21   reasonably, but "whether there is any reasonable argument that counsel satisfied *Strickland's*

22   deferential standard." *Id.*

23       The second factor required for a showing of ineffective assistance of counsel is actual

24   prejudice caused by the deficient performance. *Strickland*, 466 U.S. at 693-94.  Prejudice is found

25   where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

26

the proceeding would have been different." *Id*. at 694.   A reasonable probability is a "probability

sufficient to undermine confidence in the outcome." *Id*. *See also Williams v. Taylor*, 529 U.S. 362,

391-92 (2000); *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).   Importantly, on collateral

review, a court "need not determine whether counsel's performance was deficient before examining

the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .   If it is easier to

dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course

should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466

U.S. at 697).

### a.  Advising Petitioner Not To Testify At Trial

Petitioner claims that trial counsel improperly advised him not to testify at trial on

the grounds that his testimony would hurt and weaken his case and his claim of self-defense.   He

alleges that he would have testified that he did not load his gun to go to the scene of the fight, that

he was not called for backup, and that he did not intend to kill the victim, thus rebutting the

prosecutor's arguments to the contrary.   The Sacramento County Superior Court considered and

rejected Petitioner's claim on collateral review, explaining as follows:

> Petitioner . . . claims that his trial counsel was ineffective in advising
> and convincing petitioner not to take the stand in [sic] his behalf.
> Petitioner claims that had he testified, the jury would have learned
> that petitioner did not go to the scene with the intent to harm anyone
> and that he had no clue as to who was there.   Petitioner gives no
> further detail of what his testimony would have been, and does not
> attach any declaration under penalty of perjury setting forth that
> testimony.
>
> The claim fails.   As noted in the Third District Court of Appeal's
> opinion in the case, statements from petitioner to police were
> introduced at trial, that petitioner felt threatened by the victim, who
> was a rival gang member and who had walked toward petitioner like
> he wanted to do something to petitioner, and that the victim had shot
> at him during a prior altercation.   Also introduced were two recorded
> in-custody statements about the incident from petitioner to his
> friends, that did not raise or even allude to self-defense.   Petitioner,
> then had already given conflicting stories about what had happened.
> He now claims that had he testified, he would have given yet another

1   story.  Under the circumstances, his testimony would not have been
    believable, and trial counsel made a reasonable tactical choice to
2   advise petitioner not to take the stand and give a patently
    unbelievable story on the witness stand.  As such, trial counsel did
3   not render ineffective assistance of counsel, and the claim is denied.

4   Lodged Doc 6 at 1.

5          A tactical decision exercised by counsel deserves deference when counsel makes an

6   informed decision based on strategic trial considerations and the decision appears reasonable under

7   the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  On the other hand,

8   "it cannot be permissible trial strategy, regardless of the merits or otherwise, for counsel to override

9   the ultimate decision of a defendant to testify contrary to his advice."  *United States v. Mullins*, 315

10  F.3d 449, 453 (9th Cir. 2002).  This is so because "a defendant in a criminal case has the right to take

11  the witness stand and testify in his or her own defense."  *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).

12  The defendant may, however, waive this right, either explicitly or implicitly.  *See United States v.*

13  *Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999).  Such a waiver may be inferred from a

14  defendant's failure to testify at trial or to notify the trial court of his desire to testify.  *See id*. at 1094-

15  1095.  "Although the ultimate decision whether to testify rests with the defendant, he is presumed

16  to assent to his attorney's tactical decision not to testify," but he "can reject his attorney's tactical

17  decision by insisting on testifying, speaking to the court, or discharging his lawyer."  *United States*

18  *v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).

19         Here, petitioner has failed to demonstrate that counsel rendered prejudicially

20  ineffective assistance by advising him to waive his right to testify on his own behalf.  For the reasons

21  set forth by the state court on collateral review, counsel made a reasonable tactical decision to advise

22  petitioner not to testify.  Moreover, the record does not indicate that Petitioner ever expressed to the

23  trial court that he intended or desired to testify over counsel's objections or advice.  While Petitioner

24  may now wish, with the benefit of hindsight, that he had testified at trial, the record reflects that both

25  trial counsel and the court informed Petitioner of his right to testify, and that Petitioner explicitly

26
                                                    23

waived that right.  RT at 382-383.  Because there is a reasonable argument that counsel was not ineffective, that is the end of the question under AEDPA.  Petitioner is not entitled to federal habeas corpus relief on this claim.

### b.  Failing To Object To Prosecutor's Closing Argument

Petitioner next claims that trial counsel was ineffective for failing to object to misconduct committed by the prosecutor.  More specifically, petitioner complains that the prosecutor improperly informed the jury during closing argument that intent to kill could be inferred from the fact that Petitioner showed up at the scene of the fight with a gun in his pocket or from the fact that he pulled the gun from his pocket during the confrontation in the Florin Mall Parking lot.

The substance of Petitioner's underlying prosecutorial misconduct claim has already been discussed and rejected above.  Because the prosecutor's argument was not improper, trial counsel's failure to object on that ground cannot constitute prejudicially ineffective assistance.  By the same reasoning, Petitioner cannot demonstrate that he has suffered any prejudice as a result of trial counsel's failure to enter the proposed objection.

Petitioner is not entitled to federal habeas corpus relief on this claim.

### 2.  Appellate Counsel

Petitioner claims that appellate counsel rendered prejudicially ineffective assistance by failing to raise his claims two, three, four, five, and six on direct appeal.[2]

---

[2](2)   Trial counsel rendered prejudicially ineffective assistance by advising him that he should not testify in his own defense.

(3)   The prosecutor committed misconduct during her closing argument when she informed jurors that they could infer intent from the pulling of a handgun.

(4)   The trial court violated his right to due process of law during sentencing by failing to put the aggravating factors on the record.

(5)   The prosecutor violated his right to due process of law by misleading the jurors to believe

1       The *Strickland* standards set forth above apply to appellate counsel as well as trial

2  counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th

3  Cir. 1989).  In this case, Petitioner "must first show that his counsel was objectively unreasonable

4  . . . in failing to find arguable issues for appeal - that is, that counsel unreasonably failed to discover

5  nonfrivolous issues and to file a merits brief raising them." *Smith v. Robbins*, 528 U.S. 259, 285

6  (2000) (internal citation omitted).  Petitioner then has the burden of demonstrating that he has

7  suffered prejudice, or "a reasonable probability that, but for his counsel's unreasonable failure to file

8  a merits brief, he would have prevailed on his appeal." *Id*. (citing *Strickland*, 466 U.S. at 694).  Of

9  course, the same double AEDPA filter applies to appellate ineffective assistance claim, i.e., can any

10  reasonable argument be made that appellate counsel was not ineffective.

11       Petitioner's ineffective assistance of appellate counsel claim must fail.  The merits

12  underlying petitioner's claims two, three, four, five, and six have already been discussed thoroughly

13  and rejected, above.  Appellate counsel does not have a constitutional obligation to raise every non-

14  frivolous issue requested by the client. *Jones v . Barnes*, 463 U.S. 745, 751 (1983).  Often, appellate

15  counsel may properly omit issues if counsel reasonably foresees little or no likelihood of success on

16  that issue. *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989); *Knowles v. Mirzayance*, 556 U.S.

17  111, 127  (2009) ("Counsel also not required to have a tactical reason – above and beyond a

18  reasonable appraisal of a claim's dismal prospects for success – for recommending that a weak claim

19  be dropped altogether.").  The "weeding out of weaker issues is widely recognized as one of the

20  hallmarks of effective appellate advocacy." *Miller*, 882, F.2d at 1434. *See also Jones*, 463 U.S. at

21  751 ("Experienced advocates since time beyond memory have emphasized the importance of

22  _____

23       that his case was gang related.

24  (6)  Trial counsel rendered  prejudicially ineffective assistance by failing to enter an objection

25         when the prosecutor informed the jury during her closing argument that they could infer
           Petitioner's actions that he intended to kill the victim.

26                  25

winnowing out weaker arguments on appeal and focusing on one central issue, if possible, or at most on a few key issues."). Because the claims are without merit, appellate counsel's decision not to raise them on appeal cannot fall outside the bounds of reasonably competent professional assistance. For the same reasons that the claims are without merit, Petitioner also cannot demonstrate that counsel's decision not to raise them on appeal caused him to suffer any prejudice because there is no likelihood that the claims would have been successful on appeal.

Petitioner is not entitled to federal habeas corpus relief on his ineffective assistance of appellate counsel claim.

## VI.  CONCLUSION

For all of the foregoing reasons, the petition should be denied. Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.      Petitioner's November 9, 2010 petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 be denied; and

2.      The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time waives the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d

1153 (9th Cir. 1991).  Any reply to the objections shall be filed and served within seven days after service of the objections.

DATED: July 5, 2012

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

GGH:jh
pope3017.f&r

27